UNITED STATES of America, Appellant,

v.

Tammy BRADY, Defendant–Appellee.

No. 04–0729–CR.

United States Court of Appeals, Second Circuit.

Argued Nov. 1, 2004.

Decided: July 22, 2005.

---

Neil M. Barofsky, Assistant United States Attorney, New York, New York (Roslynn R. Mauskopf, United States Attorney, David C. James, Catherine L. Youssef, Assistant United States Attorneys, Eastern District of New York, Brooklyn, New York, of counsel), for Appellant.

Peter T. Sheridan, Law Office of Peter T. Sheridan, New York, New York, for Defendant–Appellee.

Before: CARDAMONE, CABRANES, and SOTOMAYOR, Circuit Judges.

CARDAMONE, Circuit Judge.

As Charles Dickens famously observed at the beginning of his *A Tale of Two Cities*, "It was the best of times, it was the worst of times ...."[1] The defendant on this appeal, who pled guilty to bank fraud, had a childhood that the record shows was never the best of times; it was always the worst.

The United States of America (government or appellant) appeals from a judgment and sentence entered on February 6, 2004 in the United States District Court for the Eastern District of New York (Gleeson, J.), convicting defendant Tammy Brady upon her guilty plea to one count of conspiracy to commit bank fraud in violation of 18 U.S.C. § 371 (2001). Defendant was sentenced to a term of five years probation with three months home confinement, 250 hours of community service, and ordered to pay restitution of $85,046.92 and a $100 special assessment. The government appeals this sentence declaring that the district court erred in granting Brady a five-level downward departure under § 5H1.3 of the United States Sentencing Guidelines (Guidelines or U.S.S.G.). Judge Gleeson granted the departure after finding defendant suffered extraordinary childhood abuse that created a mental or emotional condition, which caused her to commit the crime of conviction. We agree that the district court's factual findings thus far are insufficient to support the departure under the Guidelines and therefore remand.

## BACKGROUND

### A. *Defendant's Offense Conduct*

In 1988 Tammy Brady began working as a secretary at Citibank (employer or

---

**1.** Charles Dickens, *A Tale of Two Cities, in* 13 *The Works of Charles Dickens* 7, 7 (Peter Fenelon Collier & Son ed.1900) (1859).

bank), a federally-insured financial institution. Thirteen years later in 2001 when she conspired to commit fraud against her employer, she was working as a paralegal and providing litigation and other support for the handling of employment discrimination complaints. On June 13, 2001 defendant forged a memorandum to the bank's payroll department purporting to be from her supervisor. The memo requested that a check for $298,000 be issued to William Young, an expatriate employee, and delivered to Brady. Rather than cutting the check and sending it to her, the payroll department deposited the amount directly into Young's bank account. When Brady learned of this, she angrily demanded that the payroll department reverse the direct deposit. When the payroll department complied with her directives, a check was delivered to Brady payable to William Young in the amount of $170,672.42, the figure Brady had originally requested, less payroll deductions.

Defendant chose Young as the payee of the check at the behest of her co-conspirator, John Schneider, who had a friend by the same name as the payee, i.e., William Young. This name was chosen after Brady cross-referenced the Citibank employee database with a list of eight names given to her by Schneider. The government argued that Brady deliberately chose an individual on the international payroll among the options given her by Schneider as the recipient of the check because—due to complicated tax issues—an international employee's tax return would be processed by a Citibank accountant rather than the taxpayer himself or his personal accountant. This maneuver made the fraud less easy to detect. But, defendant insisted Young's expatriate status was entirely coincidental and was not an indication of the scheme's complexity. Brady gave the check to Schneider who—with the assistance of his friend Young whom he direct-

ed in the endeavor—opened several bank accounts over the next month and successfully negotiated nearly half of the check's value before the fraud was discovered by FBI agents.

Awareness of the fraud surfaced quickly because Citibank employee William Young never received the money disbursed to him. The total loss to Citibank was $85,046.92. Schneider's accomplice Young received only $1,000 for his role in the crime and the government decided not to prosecute him. Schneider planned to keep $125,000 of the $170,000 that had been stolen from Citibank. He gave defendant at least $5,000 as payment for her contribution to the conspiracy.

### B. District Court Proceedings

On August 30, 2002 an indictment was filed in the Eastern District of New York charging Brady and Schneider with bank fraud in violation of 18 U.S.C. § 1344. Two months later, on November 8, 2002 a superceding indictment was filed charging both defendants with one count of conspiracy to commit bank fraud, in violation of 18 U.S.C. § 371, as well as the aforementioned underlying substantive offense. Schneider pled guilty to the conspiracy count of the superceding indictment and was convicted and sentenced principally to 33 months imprisonment, which neither he nor the government have appealed.

On November 26, 2002 after Brady also pled guilty to the conspiracy count of the superceding indictment, the substantive counts in the original and superceding indictments were dismissed on a motion by the government. The district court later held a sentencing hearing pursuant to United States v. Fatico, 579 F.2d 707 (2d Cir.1978), to consider whether Brady's requested downward departure was warranted on the grounds that she suffered a

mental condition as a result of childhood abuse, which, in turn, caused her involvement in the conspiracy. On December 30, 2003 defendant was convicted of conspiracy to commit bank fraud and sentenced. The district court judge granted a downward departure, which reduced Brady's sentence from 12 to 18 months imprisonment to five years probation, and issued a written opinion explaining his reasons for that departure. *See United States v. Brady,* No. 02 CR 1043, 2004 WL 86414 (E.D.N.Y. Jan.20, 2004).

### C. Facts Relevant to Downward Departure

On March 27, 2004 the Probation Office issued its presentence report (PSR), which noted that defendant claimed Schneider had devised the fraudulent scheme entirely on his own. The PSR also indicated that Brady insisted she was an unwilling participant and went along with a scheme to defraud her employer only because Schneider threatened her and her young son.

According to the PSR, Brady's testimony, and supporting documentation offered at the sentencing hearing, she experienced child abuse that began in 1965 when she was an infant in Canada. Her biological parents were alcoholics and abused her and her siblings until she was 18 months old, at which time the children were placed in foster care. Brady's mother submitted an affidavit stating that defendant suffered serious physical, emotional, mental, and possibly sexual abuse at the hands of her father. Her father was also violent towards her mother..

Brady herself indicated the abuse she suffered was extreme, but that she could not recall all of her injuries. She did remember falling out of a window and breaking both legs and ankles. This injury is evidenced by lingering scars on her limbs. She also remembers suffering from spinal meningitis which she attributes to her mother's neglect. Further, a Canadian social services officer submitted a report to the district court indicating that at the age of one Brady had gangrene. The report also stated that, while in foster care, she displayed emotional and physical infirmities stemming from her abusive childhood.

Brady and her siblings were shuttled between three foster homes until 1971, when they were adopted by a couple living in Bronxville, New York. As ill luck would have it Brady's misfortune continued because her adoptive mother was also violent and abusive. From ages six to 11, Brady was beaten regularly and harmed in other ways by her adoptive mother. Her adoptive father confirmed under oath that Brady's adoptive mother abused the children and that Brady was the focus of most of the beatings. Her adoptive father stated that in addition to dealing severe blows to her adopted child's face and head, the adoptive mother forced defendant to eat cat food, locked her outdoors in inclement weather, and on one occasion held her hand to a hot radiator. He further stated that the adoptive mother beat Brady on numerous occasions and also bit her. In 1976 the adoptive father moved out of the house and took Brady and her siblings with him but, according to Brady's testimony, her adoptive mother continued to visit her at his home and abused her until she moved to New Jersey. Following this move, Brady was also sexually abused by another family member.

In 1979 when defendant was 14 years old she began to experience severe behavioral problems. As a result, her adoptive father made her a ward of the state and had her placed in a group home. She remained there, with intermittent stays at a psychiatric hospital, for four years until

she was 18 years old. At one point, she was hospitalized for suicidal ideations. After defendant left the group home she moved in with her boyfriend, with whom she had a son. Her boyfriend was also physically abusive towards her.

At the age of 14, defendant began using marijuana and alcohol and she later began using cocaine. By the age of 22, when she recognized the negative consequences for her resulting from her drug use, she sought counseling. Defendant credits this therapy for her sobriety over the next 12 years. When Brady was hired at Citibank in 1988 she experienced a relapse, and began using a variety of substances. She checked into a substance abuse rehabilitation center shortly thereafter, has regularly attended Alcoholics Anonymous (AA) meetings since 1999, and has been sober since 2000.

According to defendant, she befriended an individual named Clem Daily at her AA meetings and entrusted the details of her background to him. In December 2000 Daily introduced her to Schneider as a potential romantic interest and later gave Brady's phone number to Schneider. Defendant indicated that both Daily and Schneider were very interested in the specifics of her employment at Citibank. In the summer of 2001 Brady began dating Schneider. Shortly thereafter, Schneider inquired as to the plausibility of various plans to defraud Citibank and Brady responded by stating she did not want to participate in any such scheme. She told the Probation Office that she felt pressure from both Schneider and Daily to become involved in their plans, and that Daily would often bring up Schneider's latest suggestion at their AA meetings. In early June 2001 Schneider threatened her by commenting about his connections to organized crime and to the New York City police department and indicating that he could harm her professional life as well as her son. In the summer of 2001 while dating Schneider and seeing Daily at AA meetings, Brady's residence was broken into and her vehicle was vandalized, although she did not report these incidents to the police. In mid-June 2001 Brady capitulated to this pressure and agreed to participate in the fraudulent scheme against her employer.

Defendant stated that while the check was being generated, she hinted to her manager that "something was going on" but did not directly inform anyone at the bank of the fraudulent plan that was going forward. In July 2001 Citibank began an internal investigation of the fraud and contacted the FBI. Brady at first refused to cooperate with the FBI. During the investigation defendant's vehicle was again vandalized, and although she had changed her telephone number and the location of her AA meetings, she continued to believe Schneider and Daily were watching her closely.

In support of her argument that the abuse she suffered as a child rendered her particularly vulnerable to Schneider's dominating tactics, defendant submitted two documents. The first was a letter written by a social worker who treated Brady at the group home where she resided from 1981 to 1983. The social worker reiterated the abuse Brady experienced, detailed her behavioral problems that resulted from her upbringing, and stated that it is likely that Brady would be "susceptible to relationships in which she may be taken advantage of or abused." The second letter came from a relationship counselor, with whom Brady and her fianceé began to meet for counseling after her arrest. This counselor stated that defendant's anticipatory anxiety, which directly resulted from her history of abuse, paralyzed her from terminating her involvement in the criminal

scheme. The counselor also stated Brady's unfortunate past led her to make poor choices and also led her towards self-destructive behavior.

The PSR concluded that a downward departure was warranted based on the extreme childhood abuse suffered by Brady. This was an unusual recommendation for the Probation Office to make. *Brady,* 2004 WL 86414, at *2 n. 5. The district court agreed with the PSR and found Brady's history of abuse sufficiently extreme to warrant a departure. *Id.* at *8. It also found the severe abuse Brady suffered as a child bore a direct causal relationship to the bank fraud. It reasoned that "Schneider, who deliberately engendered in Brady an interest in a personal relationship with him, took advantage of her in precisely the manner to which her history of abuse rendered her susceptible." *Id.* The government appeals the downward departure.

## DISCUSSION

### I Standards of Review

While this appeal was pending, the Supreme Court held that the Sentencing Guidelines violated the Sixth Amendment by requiring judges to impose sentences based on facts not found by a jury beyond a reasonable doubt or admitted by the defendant. *United States v. Booker,* ––– U.S. –––, 125 S.Ct. 738, 756, 160 L.Ed.2d 621 (2005). As a remedy to this constitutional violation, the Court ruled that district court judges need no longer mandatorily apply the federal Sentencing Guidelines in calculating defendants' sentences and made the Guidelines system advisory. *Id.* at 756–57. Here, the district court judge erred in imposing the sentence as if bound by a mandatory Guidelines system. Ordinarily, we would remand so that the district court could determine whether it would impose a dif-

ferent sentence under the advisory system. *United States v. Crosby,* 397 F.3d 103, 117 (2d Cir.2005). However, the parties by letter have declined a *Crosby* remand, thus effectively waiving any remedy for the error just noted.

■ Although the Guidelines are no longer mandatory, the sentencing court must nonetheless consider the applicable Guidelines sentence and relevant policy statements before sentencing. *See Crosby,* 397 F.3d at 111 (citing 18 U.S.C. § 3553(a)(4) and *Booker,* 125 S.Ct. at 764–65). Ordinarily, it must therefore continue to calculate the Guidelines sentence as it would before *Booker,* and must take into account relevant permissible departures. *Id.* at 111–12.

Prior to *Booker,* we reviewed downward departures under the standard prescribed by the Feeney Amendment, which was formally adopted as § 401(d)(1) of the Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act of 2003 (PROTECT Act), Pub.L. No. 108–21, 117 Stat. 650 (2003)—*de novo* review for sentencing departures. This provision, codified at 18 U.S.C. § 3742(e), was excised by *Booker* and replaced with "reasonableness" review.

■ "An error in determining ... the availability of departure authority" remains, however, "the type of procedural error that could render a sentence unreasonable under *Booker.*" *United States v. Selioutsky,* 409 F.3d 114, 118 (2d Cir.2005). We therefore continue to review a district court's exercise of departure authority, and we do so by inquiring "whether the [d]istrict [c]ourt abused (or exceeded) its discretion." *Id.* at 119. "A district court 'abuses' or 'exceeds' the discretion accorded to it when (1) its decision rests on an error of law (such as application of the wrong legal principle) or a clearly errone-

ous factual finding, or (2) its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decisions." .*Zervos v. Verizon N.Y., Inc.,* 252 F.3d 163, 169 (2d Cir.2001), *cited with approval in Crosby,* 397 F.3d at 114.

## II  Downward Departure

### A.  *Applicable Law*

■■■  Section 5K2.0  of the Sentencing Guidelines authorizes the district court to depart from the range prescribed under the Guidelines if "there exists an aggravating or mitigating circumstance ... of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that ... should result in a sentence different from that described." U.S. Sentencing Guidelines Manual § 5K2.0, policy statement (citing 18 U.S.C. § 3553(b)(1)). Although, as noted earlier, the Supreme Court excised statutory language applied in the Guidelines, *see Booker,* 125 S.Ct. at 764, the general principle remains embodied in other portions of the Guidelines. For example, a court may depart when a circumstance falls outside of the "heartland" of the typical cases encompassed by each Guideline. U.S. Sentencing Guidelines Manual ch. 1, pt. A, introductory cmt. 4(b). Of course, the district court need not impose a Guidelines sentence, and may, if doing so would be reasonable, lower the sentence below the Guidelines range even when a downward departure is unavailable. We set forth these criteria for reviewing departures only as a method to analyze a sentence when a district court chooses to adhere to the Guidelines calculation, including downward departures. In so doing, we note that it is not the case—and could not be in light of *Booker,* 125 S.Ct. 767; *id.* at 794 (Scalia, J., dissent-

ing)—that "every sentence outside an applicable guideline" is *per se* unreasonable, *Crosby,* 397 F.3d at 115.

Section 5H1.3 expressly disfavors departures based upon mental and emotional conditions by stating that such conditions are not "ordinarily relevant." U.S. Sentencing Guidelines Manual § 5H1.3, policy statement. We have held by negative implication that there are indeed certain situations where a person's mental and emotional conditions may be taken into account in granting a downward departure. *See United States v. Rivera,* 192 F.3d 81, 85 (2d Cir.1999); *cf. United States v. Lara,* 905 F.2d 599, 603 (2d Cir.1990) (noting that in some cases, extraordinary situations warrant consideration of ordinarily irrelevant factors). We have further concluded that in extraordinary circumstances a downward departure may be warranted on the ground that "extreme childhood abuse caused mental and emotional conditions that contributed to the defendant's commission of the offense." *Rivera,* 192 F.3d at 85.

### B.  *Extremity of Abuse*

■■■  On appeal, the government argues that the abuse endured by Brady throughout her childhood did not reach the level of extraordinary abuse contemplated by *Rivera. See id. Rivera* involved a claim for downward departure on the ground of extreme childhood abuse and thus provides some guidance as to what situations are extraordinary enough to justify departure. *Id.* at 86. Of course, any instance of child abuse is extraordinary in common parlance; yet, in this context, the abuse must be judged against that suffered by the typical defendant, many of whom have unfortunately suffered severe abuse in their early lives, *see United States v. Vela,* 927 F.2d 197, 199 (5th Cir.1991). Thus, we adopted these high standards in *Rivera*

not because—as the government inappropriately suggests—victims of child abuse might exaggerate or stretch the truth, but rather because it is the sad fact that so many defendants have unfortunate pasts and we cannot apply a disfavored departure to many or most defendants.

The defendant in *Rivera* endured corporal punishment, including beatings and burns, that "could conceivably rise to a showing of abuse." 192 F.2d at 86. We concluded that this was not such an extraordinary circumstance that it could be found to cause mental or emotional pathology, but declined to set forth a specific legal standard as to when such a level is reached. Instead we left the standard to future development. *Id.* at 86.

Today, we take one step in that development process and reject the government's assertion that, in order for the district court to have discretion to downwardly depart, the level of abuse must be akin to the shocking and tragic abuse at issue in *United States v. Roe*, 976 F.2d 1216 (9th Cir.1992), which we cited in *Rivera*, 192 F.3d at 86. The defendant in *Roe* was severely beaten, raped, sodomized, and humiliated by her mother's boyfriend. After running away she was forced to work as a prostitute and rendered a "mindless puppet" by further abuse suffered in the trade. 976 F.2d at 1218. Far from pointing to that case as the standard for which a downward departure may be granted, we cited *Roe* as an "extreme" case which, as such, served as an example of a case that obviously and unquestionably justified a departure, whatever the standard. *Rivera*, 192 F.3d at 86.

■ Here, we conclude that the district court did not abuse its discretion in finding that the many years of abuse endured by Brady was extraordinary and her testimony to that effect was thoroughly corroborated. The district court found, and we find no error, that Brady was violently abused as an infant by both of her birth parents. *Brady*, 2004 WL 86414, at *8. After being placed in numerous foster homes, she unfortunately found no respite when finally adopted because her new mother also severely beat and tortured her in various ways for at least five years. This horrific abuse did not end with childhood. From ages 11 to 14, she was sexually abused by another family member and, in her adult life, by her boyfriend. From these accounts, the district court could find that Brady has made her requisite showing of extraordinary abuse.

## C. *Causation Requirement*

■ Availability of a § 5H1.3 downward departure on this ground also requires, however, that the defendant's history of abuse "contributed" to her commission of the offense. *Rivera*, 192 F.3d at 85. We have recently explained that the requirement of a causal nexus restricts the circumstances in which a departure on the grounds of abuse is permitted only to cases where the abuse brings about a mental condition that leads to or causes the criminal conduct. *See United States v. Reinoso*, 350 F.3d 51, 58 (2d Cir.2003). In the present case, the government contends that Brady failed to demonstrate that she suffered extraordinary abuse that impaired her mental condition. The government further argues that even if a cognizable impairment did exist, it did not lead Brady to commit the crime. The district court disagreed and found instead that defendant suffered sufficiently extreme childhood abuse and, as a result, was particularly prone to entering into relationships in which she could be manipulated and taken advantage of, and that Schneider had preyed upon her after gaining knowledge of her susceptibility. *Brady*, 2004 WL 86414, at *8.

We see no error, much less clear error, in the finding that Schneider deliberately initiated a relationship with defendant so that he could use her in the manner to which he suspected she was vulnerable. After dating defendant and gaining her trust, he manipulated her through confidential information obtained by his friend at AA meetings. Schneider then pressured her to commit the crime and possibly threatened her safety as well. We note in passing that Schneider was arrested on January 21, 2004 for assault after striking a man several times with his fist and once with a glass. This incident lends credence to Brady's assertion that she had good reason to be and was afraid of Schneider and that he threatened her on several occasions.

Further, defendant acted at the behest of Schneider, who orchestrated the fraud and instructed her to match the names he gave her to Citibank's database. Brady's lack of criminal history for over 13 years before their meeting supports the argument that Schneider was the mastermind of the crime. As such, the causation requirement would be met if Brady's mental and emotional condition at the time of the fraud had been so impaired by the abuse she suffered as to lead her to succumb to this offense.

We cannot subscribe to the government's proposition that extreme vulnerability or fear of an attacker is not a type of emotional condition that, as a matter of law, may properly be relied upon to justify a downward departure, even where such a condition leads to the commission of the crime. We also cannot agree that Brady's apparent recovery after her therapy—evidenced by the regaining of the custody of her child and obtaining employment—forecloses the possibility that she continued to suffer from the effects of the earlier child abuse. Aside from the fact that such effects may be latent or may not relate to all areas of her life, Brady continues to attend AA meetings and counseling, a legacy of her unfortunate childhood.

Nonetheless, there is sparse support in the record for a finding that Brady's impaired emotional or mental condition led her to engage in a conspiracy to commit bank fraud. The government argues that numerous facts belie Brady's claim that she was pressured or coerced into engaging in the charged fraud. Brady admitted at her *Fatico* hearing that at the time she agreed to participate in Schneider's scheme, he had not threatened her and she had finally acquiesced in the scheme only after he proposed a "feasible" way of defrauding Citibank and agreed to her demands that she be paid $85,000 instead of $15,000 from the proceeds of the crime. The only evidence submitted by defendant suggesting that she was rendered susceptible to or suffered paralyzing fear of dominant individuals due to her abuse is a one-page letter from Brady's former social worker who has not worked with Brady since 1983. The social worker had not evaluated Brady since her teenage years and only *speculated* that the formation of such a condition "would be expected." Brady also submitted a letter from her couples' therapist who started seeing Brady after her arrest. The therapist did not contend that Brady had a mental or emotional condition that led her to commit the crime, but merely stated in general terms that "abuse can lead to poor choices." Although the letter noted that Brady has a history of fear, it wholly failed to conclude that Brady's current mental state would lead her to commit her crime of conviction. Thus, the district court did not have enough evidence before it to conclude that the causation requirement for a § 5H1.3 downward departure on the ground of childhood abuse has been met.

### III Reasonableness of Sentence

■ The fact that we find the district court's decision to depart in this case does not conform to the requirements of the Guidelines—now made advisory by *Booker*—would not necessarily render Brady's sentence unreasonable. However, here, we find that due to the nature and gravity of the district court's procedural error—failure to engage in sufficient fact finding to support departure—and the lack of clear evidence that the district court would have imposed the same sentence as a non-Guidelines sentence, *see Selioutsky,* 409 F.3d at 118 n. 7, this case must be remanded. Our conclusion is based on the fact that we are reviewing a mandatory Guidelines sentence, and intentionally leaves open the possibility that a different analysis may be warranted upon review of a non-Guidelines sentence.[2] Accordingly, we remand Brady's sentence with instructions to the district court to develop the record further on the issue of the causal connection between Brady's childhood abuse and her participation in the crime before determining whether a downward departure is warranted in this case. *See id.* at 119–20 (remanding for further factual development of the record in support of a downward departure); *United States v. Bryson,* 163 F.3d 742, 749 (2d Cir.1998) (same).

### CONCLUSION

Accordingly, for the reasons stated, we remand to the district court to impose a non-Guidelines sentence or to make the findings necessary for appropriate consideration of the downward departure and to impose a Guidelines sentence, with or without a departure. Any subsequent appeal from the sentence imposed will be returned to this panel.

---

**2.** For instance, the impact of a procedural error in calculating the Guidelines may have different implications upon the district court's duty to consider the Guidelines when it imposes a non-Guidelines sentence. Additionally, a district court judge may calculate a Guidelines sentence, including a downward departure not supported by factual findings. If the district court judge then chose to impose a non-Guidelines sentence, it is unclear after *Booker* whether we could review the calculation of the downward departure because, essentially, the district court judge refused to downwardly depart. *See United States v. Fernandez,* 127 F.3d 277, 282 (2d Cir.1997) (refusal to downwardly depart generally unreviewable). Nonetheless, the insufficiency of the factual findings may bear on the reasonableness of the non-Guidelines sentence in light of the other factors set forth in § 3553(a).