05-6439-cr
U.S. v. Canova

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2006

Heard: February 5, 2007                    Decided: May 8, 2007)

Docket No. 05-6439-cr

- - - - - - - - - - - - - - - - -
UNITED STATES OF AMERICA,
          Appellant,

          v.

JOHN CANOVA,
          Defendant-Appellee.
- - - - - - - - - - - - - - - - -

Before: MESKILL, NEWMAN, and SACK, <u>Circuit Judges</u>.

Appeal by the Government from the November 17, 2005, judgment of the United States District Court for the District of Connecticut (Alfred V. Covello, District Judge), resentencing the Defendant to probation and a $1,000 fine after a remand. <u>See</u> <u>United States v. Canova</u>, 412 F.3d 331 (2d Cir. 2005).

Remanded for resentencing.

> Eric J. Glover, Asst. U.S. Atty., New Haven, Conn. (John H. Durham, Acting U.S. Atty., William J. Nardini, Asst. U.S. Atty., New Haven, Conn., on the brief), for Appellant.
>
> Paul Shechtman, New York, N.Y. (Michael J. Grudberg, Stillman, Friedman & Schectman, P.C., New York, N.Y., on the brief), for Defendant-Appellee.

JON O. NEWMAN, Circuit Judge.

This sentencing appeal primarily concerns the reasonableness of a downward departure from a Sentencing Guidelines calculation and the reasonableness of the resulting sentence. The Government appeals from the November 17, 2005, judgment by the District Court for the District of Connecticut (Alfred V. Covello, District Judge) resentencing the Defendant, John Canova, after a remand from this Court, to one year's probation and a $1,000 fine. The Government contends that the District Court's 15-level downward departure was unreasonable and that we should remand with instructions to impose a sentence of not less than 12 months. We agree that a remand for resentencing is required, but decline to specify a minimum sentence.

## Background

The facts are set out in detail in the opinion on the prior appeal. See United States v. Canova, 412 F.3d 331 (2d Cir. 2005). We repeat only those pertinent to the issues on this appeal, as recounted at 412 F.3d at 336-40.

Canova's conduct. At all relevant times, Canova was Vice-President for Operations at Raytel Cardiac Services, Inc. ("Raytel"). Raytel performed transtelephonic pacemaker monitoring for Medicare patients. Transtelephonic monitoring involves a remote technician's testing the operation of a pacemaker by having the patient use a device to transmit telephonic signals that can be converted into an electrocardiogram ("ECG") report for review by a cardiologist.

The Medicare Coverage Issues Manual required monitoring of

pacemakers over the course of three thirty-second phases and recording the results of each phase on magnetic tape.[1]  Raytel was required to produce magnetic tape records of all three phases to receive Medicare compensation.  However, after computerized testing was introduced in 1995, some Raytel technicians began to record an abbreviated strip of magnetic tape for the last phase or to omit it altogether.  Canova knew of this practice, and the performance quotas he imposed contributed to it.  Sometime in 1999, Canova suggested to a subordinate that the Medicare Manual could be construed not to require production of a strip for the last phase if the telephonic signals were recorded in audio format.  His subordinate called Medicare, and the persons with whom he spoke could not answer his questions about the Manual.

At some point, Medicare's Connecticut carrier received an anonymous complaint that Raytel was not complying with Medicare's requirements.  In 1999, the carrier informed Raytel that it refused to pay, or was seeking reimbursement for having paid, Medicare claims for

[1]The Manual states in relevant part:

> In order for transtelephonic monitoring services to be covered, the services must consist of the following elements:
> 1. A minimum 30-second readable strip of the pacemaker in the free-running mode;
> 2. Unless contraindicated, a minimum 30-second readable strip of the pacemaker in the magnetic mode; and
> 3. A minimum 30 seconds of readable ECG strip.

Medicare Program; National Coverage Decisions, 54 Fed. Reg. 34,555-03, 34,580 (Aug. 21, 1989).

noncompliant monitoring. In response, Canova falsely wrote that Raytel had complied with all relevant regulations and was producing thirty-second strips for all three phases.

After receiving Canova's letter, Medicare decided to conduct an audit of Raytel's Connecticut facility. The day before the visit, Canova instructed his managers to tell the auditors that Raytel had complied with the Medicare Manual even though he knew this was false. Following the audit, Canova falsely asserted in a letter that Raytel's "standard operating procedure [was] to obtain the full 90 seconds of ECG." Id. at 339 (alteration in original). He also represented that Raytel would send the auditors certain records they had requested.

In March 2000, when Raytel had failed to produce the requested records, Medicare gave Raytel thirty days in which to correct deficiencies in its archive system and to certify that all data in its records complied with the Medicare requirements. Canova instructed his managers to "clean up" the requested records to make it look as if they had been printed directly from the computer archives, although the "cleaned up" records were never transmitted to Medicare. See id. at 339 & n.6. Even after learning that the requested records were noncompliant, Canova reported to Medicare that "the company had established a 'new archive system . . . populated with tests starting with December 6th, 1999,' and that he was certifying Raytel's compliance with Medicare's regulations for tests conducted after that date." Id. at 340 (omission in original).

The conviction. After indictment and a jury trial, Canova was

-4-

convicted of one count of conspiracy to defraud the United States by making false statements to Medicare agents in violation of 18 U.S.C. § 1001 and to obstruct a Medicare audit in violation of 18 U.S.C. § 1516, see 18 U.S.C. § 371; two counts of making false statements in violation of 18 U.S.C. § 1001; and one count of obstructing a federal audit by directing his employees to make false representations to auditors, see id. § 1516.

   The first sentencing. Applying the 1998 Sentencing Guidelines,[2] the Probation Department recommended in its Presentence Report ("PSR") a total offense level of 25. Starting with a base offense level of 6 under section 2F1.1(a), which governed fraud offenses, the PSR added a 13-level enhancement for a $5 million loss, see U.S.S.G. § 2F1.1(b)(1)(N); a 2-level enhancement for more than minimal planning, see id. § 2F1.1(b)(2)(A); a 2-level enhancement for Canova's leadership role, see id. § 3B1.1(c); and a 2-level enhancement for obstruction of justice based on Canova's trial testimony, see id. § 3C1.1. The total offense level of 25 and a criminal history category ("CHC") of I yielded a Guidelines sentencing range of 57 to 71 months.

At the sentencing hearing, which occurred after the Supreme Court rendered the Guidelines advisory, see United States v. Booker, 543 U.S. 220 (2005), the District Judge made it clear that he intended to impose a Guidelines sentence. Making the required Guidelines

_____

   [2]All references to the Sentencing Guidelines are to the 1998 version unless otherwise noted.

-5-

calculation, generally required even after <u>Booker</u>, <u>see</u> <u>United States v. Crosby</u>, 397 F.3d 103, 111-12 (2d Cir. 2005), he concluded that the evidence did not support a loss calculation of $5 million. The Judge found that Raytel's noncompliance did not cause Medicare any harm at all. Finding no monetary loss, the Judge calculated the Guidelines range using an "alternative method." Relying on section 2J1.2, governing obstruction of justice offenses, he started with a base offense level of 12. He then applied a 2-level enhancement for Canova's leadership role. However, he rejected the Government's request for a 2-level enhancement for obstruction of justice, observing that he could not conclude that Canova perjured himself with the specific intent to obstruct justice.

From the adjusted offense level of 14 the District Judge granted Canova a 6-level downward departure based on "his extraordinary record of civil and public service," which included service in the U.S. Marine Corps, courageous service as a volunteer firefighter, and several "Good Samaritan" acts. The final offense level of 8, combined with a CHC of I, yielded a Guidelines sentencing range of 0 to 6 months' incarceration. The District Judge sentenced Canova to one year's probation and a fine of $1,000.

    <u>The first appeal.</u> Canova unsuccessfully appealed from the denial of his motion for a new trial, but the Government's cross-appeal, challenging the sentence, was partially successful. The Government challenged the District Court's loss calculation, its denial of an obstruction-of-justice enhancement, and its charitable service

-6-

downward departure.

We first noted that, after <u>Booker</u>, a district court's sentencing decision is reviewed for reasonableness and that "a Guidelines error that appreciably influences this decision could render the final sentence unreasonable." <u>Canova</u>, 412 F.3d at 350, 351 (internal quotation marks and alterations omitted). Applying this standard, we concluded that it was necessary to remand for resentencing because the District Court had erred in declining to make a Guidelines loss calculation.

We first distinguished between actual loss and intended loss and focused most of our attention on the District Court's error in disregarding "intended" loss.[3] <u>See</u> U.S.S.G. § 2F1.1, cmt. n.8.[4] We

---

[3]Discussing actual loss, we noted the District Court's conclusion that Medicare had suffered no clinical loss. <u>See</u> <u>Canova</u>, 412 F.3d at 352. However, we emphasized, Canova's fraudulent representations concerned the tests' compliance with Medicare regulations, not their clinical value. <u>See</u> <u>id.</u> We then remarked that "it is not the task of a sentencing court to second-guess the victim's judgment as to the necessity of [its] specifications." <u>Id.</u> Accordingly, a party who contracts to have goods produced in accordance with certain specifications and who pays for those goods in reliance on fraudulent representations of compliance suffers "a measure of pecuniary loss for purposes of calculating the fraud guideline." <u>Id.</u> at 354. Nevertheless, we conceded, "[t]his does not mean that a victim's loss in a substitute goods or services case necessarily equals the full

-7-

noted that Canova had been convicted not only of offenses involving a completed fraud--furnishing test results known to be noncompliant-- but also of an offense involving intended fraud--making false statements to prevent Medicare from recouping payments made to Raytel for the noncompliant tests. See Canova, 412 F.3d at 354. The Government was entitled to recoup full payment for all noncompliant tests, see 42 U.S.C. § 1395gg; 42 C.F.R. §§ 405.371(a), 405.373, and the evidence showed that Canova knew of the Government's right to recoup, thereby providing a basis for inferring that his false statements interfered with the recoupment, see Canova, 412 F.3d at 354-55 & n.24. Because Medicare payments to Raytel during the period covered by the audit were approximately $10 million and evidence supported the Government's "conservative" conclusion that 50 percent of Raytel's tests were noncompliant, we calculated the intended loss from Canova's actions to be $5 million. See id. at 355. We also advised the District Judge that he could rely on the intended loss in determining the appropriate loss enhancement for this case, rather than make the more difficult determination of actual loss. See id. at 355 n.25; see also U.S.S.G. § 2F1.1, cmt. n.8 ("[I]f an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss.").

contract price paid." Id. at 353.

[4]The distinction between actual and intended loss is set forth in the current version of the Guidelines at U.S.S.G. § 2B1.1 cmt. n.3(A) (2006).

We declined to express an opinion on whether it would be appropriate to depart from the Guidelines range on the ground that the monetary loss overstated the seriousness of the offense, see U.S.S.G. § 2F1.1, cmt. n.11. Canova, 412 F.3d at 351 n.21. We also concluded that the District Court's error could very well have affected Canova's sentence, despite the charitable service downward departure, because of the "significant difference" between a Guidelines sentencing range that included the $5 million loss, 46 to 57 months, and the range, before the departure, that the District Court calculated, 15 to 21 months, based on no loss. See id. at 355-56.

On the remaining issues on the Government's cross-appeal, we affirmed the District Court's denial of an obstruction-of-justice enhancement, see id. at 356-58, and the 6-level downward departure for Canova's charitable service, see id. at 358-59.[5] We also stated that, on remand, the District Court could reconsider the extent of the departure "in light of the higher Guidelines range dictated by proper application of a loss enhancement." Id. at 359 n.29.

The resentencing. At the resentencing the District Judge began his Guidelines recalculation with a base offense level of 6, see U.S.S.G. § 2F1.1(a), and then added a 13-level enhancement for a loss

---

[5]We recognized that the Guidelines generally discourage downward departures on the basis of charitable or public service but stated that a departure may be appropriate when the discouraged factor "'is present to an exceptional degree.'" Canova, 412 F.3d at 358 (quoting Koon v. United States, 518 U.S. 81, 96 (1996)).

-9-

of $5 million, see id. § 2F1.1(b)(1)(N); a 2-level enhancement for more than minimal planning, see id. § 2F1.1(b)(2)(A); and a 2-level enhancement for leadership role, see id. § 3B1.1(c), for an adjusted offense level of 23. Neither party disputes this calculation.

The District Judge then granted a 15-level downward departure on the ground that the monetary loss overstated the seriousness of the offense and because "the previous departure for public service [did] not fully reflect the Court's sentencing objectives in light of the newly imposed loss enhancement."[6] As he explained, "[T]he higher guideline range calls for a more extended downward departure for the defendant's service to the country and community." As for the loss calculation, the judge commented, "[I]t's not that these tests weren't performed. It's the question whether a portion of the last test was not properly concluded." He pointed to evidence suggesting that some Medicare officials could not tell whether its policy required all three parts of the test, noting that the court could consider the "victim's own conduct." He also concluded that it was appropriate to consider Raytel's restitution in the amount of $5 million.

After applying the 15-level downward departure, the court arrived at an offense level of 8, which, when combined with a CHC of I, yielded a Guidelines range of 0 to 6 months. The District Judge resentenced Canova to one year's probation and a $1,000 fine, precisely the same sentence originally imposed.

_____

[6]The District Court did not allocate the 15 levels among the stated grounds for departure.

Discussion

Although <u>Booker</u> rendered the Sentencing Guidelines advisory, sentencing courts must still consider the factors contained in 18 U.S.C. § 3553(a), including the applicable Guidelines range and departure authority. <u>See</u> <u>United States v. Selioutsky</u>, 409 F.3d 114, 117-18 (2d Cir. 2005) (citing <u>Crosby</u>, 397 F.3d at 111-12). After considering all relevant factors, a court must decide whether to impose a Guidelines or a non-Guidelines sentence. <u>See</u> <u>id.</u> at 118 (citing <u>Crosby</u>, 397 F.3d at 113).

Before <u>Booker</u>, we reviewed downward departures under the <u>de novo</u> standard set forth in 18 U.S.C. § 3742(e). <u>See</u> <u>United States v. Brady</u>, 417 F.3d 326, 332 (2d Cir. 2005). However, <u>Booker</u> excised that provision, and substituted review of sentences for "reasonableness." <u>See</u> <u>id.</u> Reasonableness review involves consideration of both the length of the sentence (substantive reasonableness) and the procedures used to arrive at the sentence (procedural reasonableness). <u>See</u> <u>United States v. Rattoballi</u>, 452 F.3d 127, 131-32 (2d Cir. 2006).

With respect to procedural reasonableness, "[a]n error in determining the applicable Guideline range or the availability of departure authority would be the type of procedural error that could render a sentence unreasonable under <u>Booker</u>." <u>Selioutsky</u>, 409 F.3d at 118. Accordingly, we review downward departures to determine whether the sentencing court "abused (or exceeded) its discretion." <u>Id.</u> at 119. A sentencing court abuses or exceeds its discretion when its decision rests on an error of law or a clearly erroneous factual

-11-

finding or, even if not resulting from such an error, "'cannot be located within the range of permissible decisions.'" Brady, 417 F.3d at 332-33 (quoting Zervos v. Verizon N.Y., Inc., 252 F.3d 163, 169 (2d Cir. 2001)).

The Government argues that Canova's sentence is unreasonable both procedurally--i.e., the 15-level downward departure is based on the District Court's erroneous view that the $5 million loss overstated the seriousness of the offense and that the victim's conduct and Raytel's restitution were mitigating factors--and substantively--i.e., the extent of the departure is unreasonable and the resulting sentence is unreasonably low. We first consider the three alleged procedural errors.

I. Procedural Errors

(1) Whether the loss overstated the harm. The District Judge exceeded his discretion in deciding that the $5 million loss overstated the seriousness of Canova's offense. The commentary to section 2F1.1 states in relevant part:

> In a few instances, the loss determined under subsection (b)(1) may overstate the seriousness of the offense. This may occur, for example, where a defendant attempted to negotiate an instrument that was so obviously fraudulent that no one would seriously consider honoring it. In such cases, a downward departure may be warranted.

U.S.S.G. § 2F1.1 cmt. n.11. "The example suggests that this departure typically applies in cases where there is no meaningful chance that the attempted crime would have succeeded to the extent indicated by the stated loss." United States v. Crawford, 407 F.3d 1174, 1183 (11th Cir. 2005).

-12-

At the resentencing hearing, the District Judge recognized that the $5 million loss was based on the fact that Canova (or, more precisely, Raytel) was liable to Medicare for the full cost of tests performed in violation of the Medicare specifications. In reasoning that the $5 million loss overstated the seriousness of the offense, he explained, "[I]t's not that these tests weren't performed. It's the question whether a portion of the last test was not properly concluded."

The District Judge's explanation of why the $5 million loss overstates the seriousness of the offense again relates only to the actual harm: the effect of Raytel's noncompliance. The District Judge did not take into account this Court's instruction to consider the intended loss that would have resulted from Canova's attempts to obstruct Medicare's audit. Regardless of the medical value of Raytel's tests, the Government had the right to recoup $5 million in payments made for noncompliant products, and Canova's conduct was designed to prevent this recoupment. The District Judge did not make any findings to support a conclusion that the intended loss overstated the harm.

Moreover, it is questionable whether the departure authority contained in note 11 to section 2F1.1 even applies to a case such as this. The note states that instances where the loss overstates the seriousness of the offense will be "few," and offers, as an example, a case in which a defendant attempts to negotiate an instrument so obviously fraudulent that no one would consider honoring it, i.e.,

-13-

where the intended loss is almost certain not to occur. The pending case differs substantially from that example: it cannot be said that Canova's attempts to prevent Medicare from learning of Raytel's noncompliance and obtaining recoupment were certain to fail.

(2) <u>The victim's conduct.</u> The District Judge stated at the resentencing hearing that the victim's conduct was a ground for departure, noting that "even Medicare could not tell in the language of its own policy that all three parts of the test were required." The Judge apparently was referring to the testimony of a Raytel employee, Steven Boecklin, who stated at trial that he called Medicare to ask about the Manual's requirements for the third phase of monitoring and that the persons to whom he spoke did not know what the Manual meant.[7] See <u>Canova</u>, 412 F.3d at 338.

In the circumstances of this case, this factor was not a permissible ground for departure. Section 5K2.10 of the Sentencing Guidelines, entitled "Victim's Conduct," permits a downward departure "[i]f the victim's wrongful conduct contributed significantly to

---

[7]The testimony at trial showed that Boecklin called Medicare twice. He testified that he called directory assistance and said that he needed to speak to someone in Medicare. He did not know the identity of the persons to whom he spoke but assumed they were qualified to answer his question because they did not indicate otherwise. In each case, after putting him on hold for three to five minutes, they returned to the phone and said, "We don't know what it means."

-14-

provoking the offense behavior."  The response of Medicare employees cannot be considered to have provoked Canova's conduct.

(3) <u>Raytel's restitution.</u>  The District Judge also supported the downward departure by the fact that Raytel had paid $5 million in restitution.  He acknowledged that restitution was not ordinarily an appropriate ground for departure but concluded that it was appropriate in this case, citing <u>United States v. Broderson</u>, 67 F.3d 452 (2d Cir. 1995).  In <u>Broderson</u>, the defendant, acting on behalf of his employer, Grumman Data Systems Corp., had negotiated a contract with the National Aeronautics and Space Administration ("NASA").  <u>See</u> <u>id.</u> at 454.  The Truth in Negotiations Act ("TINA"), 10 U.S.C. § 2306a, which governed the negotiations, required Broderson to disclose and update to NASA all cost or pricing data.  <u>See</u> <u>id.</u>  Broderson initially disclosed a certain interest rate to NASA but failed to update the rate after it had been reduced.  <u>See</u> <u>id.</u> at 455.  He subsequently certified in writing Grumman's compliance with the Act.  <u>See</u> <u>id.</u> Broderson was convicted of numerous counts of executing a major fraud scheme, engaging in wire fraud, and making false statements.  <u>See</u> <u>id.</u> The District Judge granted Broderson a 7-level downward departure based on his conclusions that the loss calculation overstated the seriousness of the offense and that there were mitigating circumstances not adequately taken into account by the Guidelines.  <u>See</u> <u>id.</u>  In particular, he observed that Broderson did not profit personally, the contract was favorable to the Government, and Grumman had paid restitution to the Government.  <u>See</u> <u>id.</u>

-15-

On appeal, the Government challenged the District Court's downward departure. See id. at 457-58. With respect to restitution, we stated, "Ordinarily, payment of restitution is not an appropriate basis for downward departure . . . because it is adequately taken into account by Guidelines Section 3E1.1, dealing with acceptance of responsibility." Id. at 458. Nor were the other factors mentioned by the District Court typical grounds for departure. See id. at 459. However, we concluded that the departure was permissible in light of the District Court's "special competence in determining whether a case is outside the heartland," id. (internal quotation marks omitted), which the Commission has defined as "a set of typical cases embodying the conduct that each guideline describes," U.S.S.G. ch. 1 pt. A(4)(b). We took into account the facts that (1) Broderson did not set out to mislead the government and therefore was unlike the typical fraud defendant, (2) he did not personally profit from the fraud, (3) the fraud was not "mainstream fraud" because negotiators do not usually reveal their costs to each other, and (4) the Government had recovered contractual and civil damages from Grumman. See Broderson, 67 F.3d at 459.

By citing Broderson, the District Judge here presumably believed that it was appropriate to consider Raytel's restitution because he did not believe Canova to be a typical fraud defendant. As Canova contends, this case does resemble Broderson in some aspects. Canova did not personally profit from his fraud, he did not falsify test results or engage in other typical fraud, Medicare's recoupment rights

-16-

allowed it to recover more than its actual pecuniary loss, and, accordingly, Medicare profited from Raytel's $5 million restitution.

However, Canova and the District Court overlooked important differences. Most notably, by making false representations and instructing employees to make false representations, Canova actively attempted to obstruct the Government's audit in order to prevent the Government from recouping significant sums of money to which it was entitled. See Canova, 412 F.3d at 355 (recounting Canova's testimony that he knew that recoupment would be "a large bullet to take as a financial hit"). By contrast, Broderson's conviction stemmed only from his certification that his employer had complied with the TINA, and he did not initially intend to deceive the Government. Moreover, in the pending case, Raytel paid restitution only as part of a plea agreement in its criminal case. See id. The fact that the Government had to bring a criminal indictment to obtain money to which it was entitled illustrates the seriousness of Canova's conduct.

Raytel's restitution could not properly contribute much if anything to a departure in view of the significant differences between Canova's conduct and the conduct in Broderson.

II. Substantive Unreasonableness

In many cases involving a departure, it would be appropriate to consider separately the reasonableness of the extent of the departure and the reasonableness of the resulting sentence. In this case, however, where the departure resulted in a sentence of no imprisonment at all, the considerations that bear on the reasonableness of the

extent of the departure apply equally to the reasonableness of the sentence, and at this point we need consider only the reasonableness of the extent of the departure.

The Government contends that the 15-level departure was unreasonable. The Defendant responds that the original 6-level departure for exceptional charitable service could permissibly have been increased to 8 levels in view of the increased base offense level from which the departure was made, and that the remaining 7 levels of the departure could permissibly be attributed to the claimed overstatement of the loss. On the first appeal we recognized that a somewhat increased downward departure based on Canova's charitable service (or perhaps a non-Guidelines sentence) might be appropriate in view of the significant increase in the adjusted offense level. See Canova, 412 F.3d at 359 n.29 (citing United States v. Elefant, 999 F.2d 674, 678 (2d Cir. 1993) (recognizing that the extent of a departure may be increased if the offense level from which the departure is made is increased)).

We have some doubt whether a departure can be justified by dividing its aggregate extent into component parts, each attributable to different grounds. However, since the District Judge did not explain the departure on the basis now advanced by the Defendant, and since our review is normally based on the rationale put forth by the sentencing judge, see Rattoballi, 452 F.3d at 134 (the Court's "ability to uphold a sentence as reasonable will be informed by the district court's statement of reasons (or lack thereof) for the

-18-

sentence that it elects to impose"), we will assess the departure by considering its aggregate extent.

We have not set forth any particular method for assessing the extent of a departure in order to determine its reasonableness. Several methods can plausibly be advanced, grouped within either of two categories--an absolute assessment or a relative assessment. An absolute assessment would gauge the extent of the departure, measured in levels, without regard to the starting point from which the departure was made. Such an assessment could consider only the number of levels the departure spans--in the pending case, 15. A relative assessment would gauge the extent of the departure either by the increase or decrease in the resulting prison time (from the prison time for the adjusted offense level) or by the percentage of increase or decrease of either prison time or levels. Using a relative assessment based on prison time would require noting either the tops of the original and new ranges or the bottoms of such ranges,[8] as

_____

[8]We note that some courts, when calculating a percentage by which a non-Guidelines sentence varies from a Guidelines sentence, have used the top of the range when assessing an increased sentence, see, e.g., United States v. Sindima, 478 F.3d 467, 472 (2d Cir. 2007); United States v. Valtierra-Rojas, 468 F.3d 1235, 1240 (10th Cir. 2006); United States v. Larrabee, 436 F.3d 890, 892 (8th Cir. 2006), and the bottom of the range when assessing a reduced sentence, see, e.g., United States v. Trupin, 475 F.3d 71, 72 (2d Cir. 2007); United States v. Plaza, 471 F.3d 876, 879 (8th Cir. 2006); United States v. Maloney,

-19-

illustrated in the margin.[9]

_____

466 F.3d 663, 669 (8th Cir. 2006).

[9]For example, in the pending case, the adjusted base offense level was 23, which, in CHC I, would have yielded a sentencing range of 46 to 57 months.  The 15-level departure reduced the offense level to 8, yielding a sentencing range of 0 to 6 months.  Expressed in months, the reduction is 51 months if the tops of the ranges are used (57 minus 6) and 46 months if the bottoms are used (46 minus 0).  Expressed in percentages of months, the reduction is 89 percent if the tops of the ranges are used (and the resulting top is 11 percent of the original top); because in this instance the bottom of the new range is 0, a percentage calculation using the bottoms is meaningless.  Expressed in percentage of levels, the 15-level reduction is 65 percent of the original level of 23 (and the resulting level of 8 is 35 percent of the original level).

Relative assessments of the same absolute reduction of levels will yield different results in months of reduction and sometimes in percentages of reduction depending on the adjusted offense level from which the reduction (or increase) was made.  For example, a 6-level reduction from level 14 (in CHC I) to level 8 would reduce the tops of the sentencing ranges by 15 months (from 21 to 6 months), which is a 71 percent reduction (and the resulting top is 29 percent of the original top); the same 6-level reduction from level 36 to level 30 would reduce the tops of the sentencing ranges by 114 months (from 235

-20-

We decline to specify any one measurement technique as a preferred method for assessing the extent of a departure, although one of the various techniques of relative assessment, or a combination of these techniques, will usually be more informative than an absolute assessment.[10]  Whenever the extent of a decrease (or increase) is

to 121 months), which is a 48.5 percent reduction (and the resulting top is 51.5 percent of the original top).  Apart from a reduction in levels, a reduction of a fixed number of months will always yield a higher percentage reduction if the original sentence was low than if it was high. See United States v. Wallace, 458 F.3d 606, 613 (7th Cir. 2006) (noting that a 24-month reduction of a 25-month sentence would be a 96 percent reduction, and the same reduction of a 240-month sentence would be a 10 percent reduction).

We set forth these calculations only to illustrate the consequences of various available approaches, not to require sentencing judges to determine any percentage reductions or increases.

[10]Besides comparing sentencing ranges before and after departures or imposition of non-Guidelines sentences, some courts have used other techniques to make a relative assessment of the extent of a departure or the difference between a Guidelines and a non-Guidelines sentence. In United States v. Sindima, 478 F.3d 467 (2d Cir. 2007), we noted that had the defendant been in CHC VI, appropriate for a career criminal, instead of CHC I, the high end of the range would have been lower than the non-Guidelines sentence imposed. See id. at 472.  In

-21-

assessed for reasonableness, it seems evident that the starting point should be considered.  In the pending case, for example, the fact that the reduction is 15 levels is not nearly as informative as the fact that the reduction reduced the tops of the ranges by 51 months or 89 percent and resulted in a top that was only 11 percent of the original top.

Transcending the numbers in this case, however, is the blunt fact that the effect of the departure and the resulting sentence was to treat Canova as though he had intended to cause no loss at all. Canova's sentence was probation when the District Judge understood that no actual or intended loss had occurred, and it remained probation even after this Court's remand made clear that Canova had caused some actual loss and had intended a loss of $5 million. Although unusual circumstances might arise in which it would be reasonable to impose the same sentence after a significant aggravating (or mitigating) factor had been taken into consideration, such an outcome would require a persuasive justification.  Since the District Judge sentenced here without any consideration of the $5 million loss that Canova intended, a departure that results in the reimposition of the same sentence appears to be unreasonable.  However, in the absence of the District Court's consideration of the impact of the intended

_____

United States v. Rajwani, 476 F.3d 243 (5th Cir. 2007), the Court compared the extent of an upward departure to the extent of two departures for which the Sentencing Guidelines specified a precise number of levels. See id. at 253 n.27.

loss on the sentencing decision, <u>see</u> 18 U.S.C. § 3553(a)(2) (requiring sentencing court to consider, among other things, need for sentence to reflect seriousness of offense), we make no ultimate ruling on the reasonableness of the departure.  Although we are not inclined to specify a minimum sentence, as urged by the Government, we will remand to the District Court for careful reconsideration in light of this opinion.

## Conclusion

The case is remanded for resentencing.